IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN BRANCH | ; CIVIL ACTION NO. |
| 6838 OAKLEY STREET, APT. 1 | : |
| PHILADELPHIA, PA 19111 | ; JURY TRIAL DEMANDED |
| PLAINTIFF, | : |
| | : |
| V. | : |
| | : |
| THE BUILDING PEOPLE | : |
| 600 MERMAID LANE | : |
| GLENSIDE, PA 19038 | : |
| DEFENDANT, | : |
| AND | : |
| | : |
| TEAMSTERS LOCAL 115 | : |
| 10965 DECATUR ROAD | : |
| PHILADELPHIA, PA 19154 | : |
| DEFENDANT. | : |

COMPLAINT IN CIVIL ACTION

JURISDICTION

1. This complaint is brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. S 1981 ("Section 1981"). Jurisdiction is appropriate pursuant to 28 U.S.C. 1331 and the aforementioned statutes. The plaintiff invokes the Federal Court's supplemental jurisdiction to hear and adjudicate state law claims pursuant to

28 U.S.C. S 1367.

VENUE

2. Venue is appropriate in the United States District Court for the Eastern District of Pennsylvania because the plaintiff and the defendants are located in that applicable district, and the events that form the basis for the averments in this matter, occurred in that applicable district.

PARTIES

3. The plaintiff, Stephen Branch (from hereinafter, "the plaintiff"), is an adult resident and citizen of the Commonwealth of Pennsylvania, who resides at the address indicated in the caption above.

4. The defendant, The Building People ("the Building People"), is a privately owned business entity, which has an address that is indicated in the caption above, and it does significant business at that address.

5. The defendant, Teamsters Local 115 is a union, which has an address that is indicated in the caption above, and it does significant business at that address in Philadelphia, PA.

ADMINISTRATIVE AGENCY REQUIREMENTS

6. The plaintiff filed a charge of discrimination against defendant, The Building People with the United States Equal Employment Opportunity

Commission (EEOC) at Charge No. 530-2025-08291, which was cross-filed with the Pennsylvania Human Relations Commission (PHRC). The plaintiff received a Notice of Right to Sue Letter for that charge dated October 7, 2026, which the plaintiff received on that date.

FACTUAL ALLEGATIONS

7. The plaintiff is of the African American/Black race and he is black.
8. The plaintiff was hired by The Building People as a plant operator in December 2024, a position which he was extremely well qualified for based on his experience and capabilities for the position.
9. During his employment for The Building People, the plaintiff performed his duties as a plant operator in no less than a satisfactory manner, and he performed his duties excellently, which the defendant knew.
10. The plaintiff was hired as a seasonal employee and was initially projected to work from the time of his hire, until around March 2025.
11. The Building People informed the plaintiff, through its management, that he would be the first choice for any positions that opened up, during and/or after his seasonal work concluded – this was based on the fact, that the plaintiff had joined the union, defendant Teamsters Local 115 ("the Union").

12. The plaintiff joined the Union, and he committed to The Building People, that he would be available to work for it, the next year in the winter of 2025.

13. On/around May 30, 2025, a Caucasian Building People employee resigned; the plaintiff was eligible and qualified for that person's vacant position, which The Building People knew – this was a plant operator position.

14. Rather than hiring the plaintiff as it had told him it would do, the Building People hired a Caucasian employee for the vacant position referred to in paragraph 13 above – that person was not a union member as the plaintiff was.

15. On/around July 24, 2025, The Building People hired the Caucasian applicant referred to above in paragraph 14 above – that person had less seniority than the plaintiff, and he also was not a member of the Union (Union members were to have been given preference in hiring over non-union applicants according to The Building People's procedures and policies and the collective bargaining agreement (CBA) between the defendants.

16. The Building People had also denied the vacant position to another African American employee, who was also better qualified than the Caucasian employee who was hired, including based on seniority, union membership, and experience.

17. In addition to being hired over the plaintiff, the Caucasian employee was allowed to work more hours than a similarly situated African American employee.

18. The plaintiff attempted to get The Building People to hire him for the position that was filled with a Caucasian applicant on/around July 24, 2025, by directly communicating with that defendant's management for approximately two weeks.

19. However, the Building People refused to change its decision.

20. The Union told the plaintiff that he was not hired him because he had disciplinary action taken against him and because the plaintiff had allegedly informed The Building People that he would not be returning to work for it.

21. The plaintiff did not commit any misconduct while working for The Building People, which knew this, and it issued the plaintiff discipline on a knowingly false basis; it is also false that the plaintiff told the defendant that he would not be returning to work for it.

22. The plaintiff continued to speak to the defendant to rectify the matter, as his non-selection for the vacant position was based on falsity.

23. The plaintiff told The Building People that the defendant, the Union, had failed to properly represent him during a disciplinary process, including that it told him that if he signed off on the false discipline that The Building People had issued against him, that it would only be a low level of discipline, a verbal warning in writing, which would not prevent him from being hired for fulltime positions with The Building People.

24. The Building People discriminated against the plaintiff based on his race and his color, by refusing to hire him for the plant operator position, in favor of a non- union Caucasian applicant, in violation of its own procedures for hiring (preference for union members).

25. As a result of the defendant's refusal to hire him, the plaintiff suffered economic damage, in the form of lost wages and the value of benefits.

26. As a result of the defendant's refusal to hire him, the plaintiff suffered severe emotional distress.

27. After the plaintiff was hired by The Building People in/around late 2024, he sought to join the Union, and eventually did obtain membership in it, however, for reasons unstated, the Union delayed his membership.

28. The Union intentionally did not timely inform the plaintiff of his right to join it after his hire in/around late 2024, and it refused to provide him with the necessary forms to complete for union membership.

29. Thereafter, the Union intentionally refused to properly represent the plaintiff when he was falsely charged by The Building People, with misconduct.

30. The Building People falsely accused the plaintiff of not attending work as scheduled and for lateness, neither of which occurred; both defendants knew such charges were false.

31. The plaintiff worked the hours that he was told to work and he was not late – in fact due to The Building People's manpower shortage, the plaintiff worked more hours than he was supposed to work as a seasonal

employee, virtually working most days of the week, to The Building People's great benefit.

32. Both the Building People and the Union knew that the plaintiff was working the extra hours referred to in paragraph 31 above; In this sense, he also was more qualified for the vacant position for which The Building People refused to offer to him but rather hired a Caucasian non-union member.

33. There was a work condition for The Building People that the plaintiff and his coworkers were working out of a room in its building, which was frigidly cold and had no heat in the winter – The Building People allowed its employees to work in other rooms in the building based on the unhealthy cold temperatures in their regularly assigned room.

34. The Building People allowed the plaintiff's similarly situated Caucasian employees to work outside of the frigidly cold room, without accusing them of misconduct by abandoning their work, while conversely it disciplined the plaintiff for the same thing, even though the plaintiff's management knew what he was doing and endorsed it.

35. The plaintiff was also disciplined for allegedly allowing an unauthorized person to come onto The Building People's premises, his wife, who came to bring him lunch – conversely, The Building People and the Union knew that it allowed similarly situated Caucasian employees to routinely do the same thing, which had been done historically, without any sanction or issuance of discipline.

36. During the plaintiff's disciplinary process with the Building People, he was represented by a Union steward named Mr. Brigandine, who is Caucasian.

37. The plaintiff told Mr. Brigandine prior to the disciplinary conference that he had not committed misconduct, and that he was being treated differently than his similarly situated co-workers regarding working in a room in the building that had heat and he knew that the plaintiff was never late, particularly in the context where the plaintiff was working extra hours at The Building People's request because it was shorthanded. However, despite his knowledge of racially disparate treatment against the plaintiff, Mr. Brigandine strongly advised the plaintiff to accept false discipline.

38. Mr. Brigandine intentionally misled the plaintiff about the ramifications of accepting discipline, including its potential effect on promotion and rehire; Mr. Brigandine falsely told the plaintiff that he was only signing off on a verbal warning, when in fact he knew that the plaintiff was signing off on a written warning.

39. The written warning had the ability to negatively impact the plaintiff's chances for promotion and rehire with The Building People, which Mr. Brigandine knew, but concealed from the plaintiff.

40. Mr. Brigandine and another Caucasian Union official told defendant, The Building People, not to rehire the plaintiff after his seasonal work ended – intentionally sabotaging their union brother; upon reasonable information and belief, Mr. Brigandine and the other Union official did not ask or advise The Building People not to rehire similarly situated Caucasian union members, as they did the plaintiff.

41. Nor did Mr. Brigandine advise similarly situated Caucasian Union members to accept false and/or specious discipline, as he did the plaintiff.

42. The Building People acted on Mr. Brigandine's request and refused to hire the plaintiff for the plaint operator position referred to above, for which The Building People selected a Caucasian applicant for that position, whom the plaintiff should have been given priority over for hire, based on his Union membership and the Caucasian hire's lack of such membership; Both defendants were aware of this fact.

43. Mr. Brigandine and the Union discriminated against the plaintiff based on his race, by purposely refusing to properly represent him in a disciplinary process, refusing to zealously advocate on his behalf, purposely deceiving him about the severe consequences of the discipline they advised him to accept, and by sabotaging his rehire by requesting that The Building People not rehire him.

44. Mr. Brigandine refused to provide the plaintiff with the forms to complete to become a Union member – the plaintiff had to obtain them from the Union's benefit office – the plaintiff officially became a Union member effective March 1, 2025, which made him eligible for fulltime employment (the Union was knew these facts) when vacancies arose at The Building People.

45. Both defendants knew that family members were allowed on the work site to deliver food to employees, but The Building People disingenuously singled the plaintiff out for discipline for this.

46. The plaintiff's supervisor with the Building People, was Mr. Axel, who is Caucasian – Mr. Axel knew that the plaintiff had not committed offenses warranting a written warning, and he knew that he was disciplining the plaintiff on March 13, 2025, for conduct that he excused for his Caucasian subordinates, the plaintiff's co-workers.

47. Mr. Axel told the plaintiff on March 13, 2025, that he was only issuing him a verbal warning, which was false.

48. Mr. Brigandine also knew that it was false that the plaintiff was only receiving a verbal warning, and he also falsely told the plaintiff that what turned out to be a written warning, would be removed from the plaintiff's personnel file after a short period of time (which is believed to be false), intentionally giving the plaintiff the false impression that his future employment with The Building People would not be negatively impacted, if he signed off on the discipline rather than fight it.

49. Mr. Brigandine had shown the plaintiff a room in his building that had functioning heat and he told him that he was allowed to work out of that room – Mr. Brigandine refused to tell The Building People this fact at the disciplinary conference on March 13, 2025.

50. After he was not hired for the plant operator position on/around July 24, 2025, the plaintiff sought out Mr. Brigandine to no avail, and the plaintiff eventually spoke to Mr. Darden, the Union's business agent, about Mr. Brigandine's actions summarized above – Mr. Darden told the plaintiff that he should have grieved the discipline that he was issued, and he refused to take any further corrective action on the plaintiff's behalf (Mr. Darden is Caucasian).

51. Ms. Malik worked in Human Resources for The Building People; she told the plaintiff that the Union had told The Building People not to rehire him.

52. The plaintiff called Mr. Brigandine repeatedly, who refused to take the plaintiff's calls and refused to call him back.

53. Ms. Malik told the plaintiff that the Union had falsely told her that the plaintiff was not a Union member and that it told her not to rehire him – the plaintiff became a Union member on/around March 1, 2025; the

plaintiff reported this information to Mr. Darden, who refused to take any corrective action.

54. As a result of the Union's actions against him summarized above, the plaintiff suffered severe economic harm, including lost wages from not being rehired as the plant operator.

55. As a result of the Union's actions against him summarized above, the plaintiff suffered severe emotional distress.

COUNT ONE – RACIAL DISCRIMINATION AND COLOR DISCRIMINATION BY DEFENDANT THE BUIDLING PEOPLE IN VIOLATION OF TITLE VII

56. The plaintiff incorporates paragraphs 1-55 above as though fully set forth herein.

57. Defendant The Building People intentionally discriminated against the plaintiff based on his race, African American/Black and his color, Black with respect to the terms and conditions of his employment, including falsely disciplining him, and refusing to rehire and promote him, favor of a non-Union Caucasian applicant, when the plaintiff should have been given preference over that person based on his Union membership.

58. The defendant intentionally treated the plaintiff worse than his similarly situated Caucasian co-workers with respect to the terms and conditions of his employment, based on his race and color.

59. The plaintiff suffered economic harm and severe emotional distress from the defendant's intentional and malicious conduct.

WHEREFORE, the plaintiff requests judgment against the defendant, The Building People, and he requests the following relief:

a. Back pay;

b. Front pay;

c. Compensatory damages;

d. Punitive damages;

e. Reasonable attorney fees and costs;

f. Any other relief the Court deems appropriate.

## COUNT TWO – RACIAL DISCRIMINATION BY TEAMSTERS LOCAL 115 IN VIOLATION OF 42 U.S.C. S 1981

60. The plaintiff incorporates paragraphs 1-59 above as though fully set forth herein.

61. Defendant, Teamsters Local 115 intentionally discriminated against the plaintiff based on his race, African American/Black with respect to the terms and conditions of his Union membership – it intentionally treated him worse than his similarly situated Caucasian Union members by refusing to properly represent him, attempting to deny him membership, mispresenting crucial facts related to his employment with The Building People, and intentionally sabotaging his employment with that entity.

62. As a result of the defendant's intentional and malicious conduct summarized above, the plaintiff suffered economic harm and severe emotional distress.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant, Teamsters Local 115, and he requests the following relief:

a. Compensatory damages;
b. Punitive damages;
c. Reasonable attorney fees and costs;
d. Any other relief the Court deems appropriate.

## COUNT THREE – VIOLAITON OF THE PENNSYLVANIA HUMAN RELATIONS ACT BY DEFENDANT THE BUILDING PEOPLE BASED ON RACIAL AND COLOR DISCRIMINATION

63. The plaintiff incorporates paragraphs 1-62 above as though fully set forth herein.

64. Defendant, the Building People intentionally discriminated against the plaintiff based on his race and color with respect to the terms and conditions of his employment, as summarized above.

65. The plaintiff suffered economic harm and severe emotional distress from the defendant's conduct.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant and he requests the following relief:

a. Back pay;

b. Front pay;

c. Compensatory damages

d. Reasonable attorney fees and costs

e. Any other relief the Court deems appropriate.

Respectfully submitted,

/s/ Reginald Allen, Esquire